No. 23,483.

C. E. Sissell, *Appellant*, v. Sihler Serum Company, *Appellee.*

SYLLABUS BY THE COURT.

1. Damages—*Negligence in Examination and Vaccination of Hogs—Competent Evidence.* Evidence of what was by experts considered proper care in the examination and vaccination of hogs at the time and place those of the plaintiff were vaccinated, was properly received.

2. New Trial—*Newly Discovered Evidence—Want of Diligence.* The showing for a new trial on the ground of newly discovered evidence failed to include diligence or any effort for a delay or recess until the missing evidence could be procured. Neither did it appear that with the desired evidence introduced a different conclusion would probably have been reached. Refusal of a new trial held no error.

3. Same—*Instructions.* The instructions refused and those given examined and no error found in respect to either.

Appeal from Republic district court; John C. Hogin, judge. Opinion filed February 11, 1922. Affirmed.

*Nelson J. Ward,* of Belleville, for the appellant.
*W. D. Vance,* and *R. E. McTaggart,* both of Belleville, for the appellee.

The opinion of the court was delivered by

West, J.: The plaintiff in his amended petition alleged that he had placed an order for two carloads of stock hogs with Dell H. Hubbard, manager of a live-stock commission business, and authorized him to purchase and ship them to him at Belleville; that Hubbard purchased for his account 320 stock hogs for which plaintiff paid $4,137.76, exclusive of certain costs and commissions; that they were purchased at a public stockyard, the plaintiff not being present and not seeing the stock until delivered to him at Belleville; that the hogs were kept in the stockyards until loaded and shipped by Hubbard; that Hubbard caused a portion of them to be vaccinated; that 42 of them were resold by Hubbard for the sum of $390.85, and the remainder, 278, shipped to the plaintiff. It was further alleged that the live-stock sanitary commissioner had in effect certain rules and regulations excluding certain hogs from certain stockyards, and requiring among other things a thorough investigation of the health, condition and temperature of each hog vaccinated, and requiring dipping and various other things. It was alleged that Hubbard employed the defendant serum company to inspect, investigate and vaccinate 295 of these hogs and that Dr. H. J. Cairns on behalf of the company undertook to vaccinate 278

head; that the serum company, through Doctor Cairns, discovered and had reason to believe that many of the hogs were unhealthy and affected with contagious and infectious diseases and that 17 were cut out of the herd and not vaccinated, and notwithstanding such knowledge and investigation the company made no report to the live-stock sanitary commissioner but passed the hogs as healthy and wrongfully obtained permission from him for their shipment; that 278 hogs vaccinated were unhealthy, sick with cholera and had other infectious and contagious diseases, of all of which the company had knowledge or means of knowledge and failed to take proper precaution or care before and after such vaccination; that with such knowledge the company shipped the hogs to the plaintiff with the knowledge or means of knowledge that at least a portion of them were diseased and infected with hog cholera, or with other infectious and contagious diseases; that six of them were dead and that one of the infectious and contagious diseases with which they were affected before, and at the time of the vaccination, was hog cholera; that 102 hogs died of hog cholera and others became sick, and the plaintiff hired skilled veterinarians to examine and treat them; and that his entire loss was $2,762, for which he prayed judgment.

The company answered by general denial, and alleged also that if any loss had occurred it was caused by the carelessness and negligence of the plaintiff or his agents and employees in the handling of the hogs after their shipment.

The court instructed, among other things, that it is the duty of the owner or person in charge of any domestic animals who discovers or has reason to believe that they are affected with any infectious or contagious disease to report such fact to the live-stock sanitary commissioner; that if the defendant with such knowledge or means thereof failed to make such report it would be liable for any damage resulting therefrom, provided such act on its part was the proximate cause thereof and the plaintiff did not in any way contribute to the loss. It was also charged that it was the duty of the company to first ascertain whether the hogs were in condition for vaccination, and to inspect their health and take their temperature and to perform the work in a manner generally recognized to be skillful by men connected with the discovery, prevention and treatment of diseases common to hogs. That the company did not become the insurer or guarantor that the hogs vaccinated by it would

not die as a result of cholera infection or any other diseased condition or infection, "but would only be liable to the plaintiff for such damages as directly resulted from carelessness or negligence on its part, or on the part of its employees and agents, in the performance of the work undertaken by it for the plaintiff." That if they found from the evidence that the Kansas City Stock Yards were what is known as "exposed" or "infected" yards and either or both parties to this action had knowledge of such fact, they or either of them having such knowledge would be bound thereby and would be required to act with such care and prudence as would be necessary under such knowledge. Also, that some evidence had been offered that the live-stock sanitary commissioner and the serum company had accepted as facts that hogs were healthy which did not show a temperature over 104 degrees, and that a carload of hogs, which did not show more than 15 rejected, were also healthy, and if the commissioner approved and indorsed the usages and customs they would be justified in finding any act of the defendant company in accordance therewith to be proper and skillful and not negligent. The jury returned a verdict in favor of the defendant and answered special questions to the effect that at the time of the inspection and vaccination there were no visible, outward signs of any infectious or contagious diseases, and that the company was not guilty of any negligence in inspection or vaccination; that when the company's representative examined the hogs none of them was sick or unhealthy with any infectious or contagious disease; also, at the time they were vaccinated none of them was unhealthy with any infectious or contagious disease.

The plaintiff appeals and complains of the admission of certain testimony, giving and receiving certain instructions and denying the motion for a new trial, and refusing to set aside the findings of the jury. But in his brief counsel says: "The real error committed in this case, as contended by the appellant, is in the introduction of testimony by the appellees as to certain claimed customs and usages in the Kansas City stockyards, wherein it was claimed that it was the custom to not reject hogs which do not have temperatures exceeding 104 degrees, and that if there were no more than fifteen to a carload which had temperatures exceeding 104 degrees not to reject the whole carload," and he insists that the evidence to change the rules and regulations of the laws of Kansas was improper, prejudicial, and defeated recovery in this case; and

that the court erred in admitting such testimony over the objections of the plaintiff. He calls attention to the fact that in support of the motion for a new trial he produced the testimony of J. H. Mercer, live-stock sanitary commissioner, showing that such evidence as to usages was in fact untrue and that the companies were held strictly to the laws and regulations of his department. It is also contended that the court erred in charging that the plaintiff could not recover if he in any wise contributed to his loss; that contributory negligence is no defense in this sort of action.

The court charged that if these usages or customs were not approved and indorsed by the commissioner, then the jury might "consider them as circumstances to enable them to determine whether or not such acts were proper and not negligent."

Doctor Cairns testified that he was familiar with the rules and regulations of the commissioner and the practice as to temperaturing of hogs in the stockyards, and when asked what was the regulation or rule of practice as to what degree of temperature should be permitted in hogs in relation to vaccination, he answered:

"They considered that anything that had a temperature from 104 up as temperature and they were to be thrown out and not vaccinated.

.　.　.　.　.　.　.　.　.　.　.　.　.　.

"Q. Now in actual practice in the yards there did you become familiar with the interpretation and the practice of the Live Stock Sanitary Department in regard to the application of those rules I have quoted you as to the matter of inspection and vaccination of hogs? A. Yes, sir.

"Q. And what is the fact as to whether or not that department had a practice, had an interpretation, had a regulation as to what temperature should be developed in hogs as a foundation for the question as to whether they should or should not be vaccinated? . . . . A. Yes sir.

"Q. What is the practice or regulation that the state department recognizes as to the degree of temperature permitted in such hogs? . . . A. They consider everything normal up to 104, from 104 up as abnormal. . . .

"Q. And what was the fact in January, 1918, as to the rule and practice or recognition of this department of the Government of the United States as to what temperature any hog would be permitted without condemning them as being diseased hogs? . . . A. They consider anything up to 104 as normal.

.　.　.　.　.　.　.　.　.　.　.　.　.　.

"Q. What was the actual practice and rule, if any, recognized and permitted by the State Department as to the number of hogs per carload which should condemn or cause the rejection of the whole car load . . .? A. When there were more than 15 to a car load showing temperature."

Doctor Sihler testified to substantially the same things. Doctor Little testified, among other things, that the dampness in the vacci-

29—110 Kan.

nating yards would have a tendency to develop pneumonia; that the methods he followed in the matter of vaccination and shipment of these hogs were such as he followed from day to day in the vaccination and shipment of hogs in Kansas; that it is not uncommon for disease to subsequently develop in shipments handled in the same manner as this shipment was handled; that if a hog is infected with some other disease at the time of the administration of the anti-hog-cholera serum the result is to aggravate such other disease. Doctor Hann testified that pneumonia is a disease common to hogs at certain times of the year and may be caused by an unhealthy condition and exposure; that the period of cholera from natural infection is fourteen days; that a temperature of 104 or more in a hog indicates that it had probably been exposed to cholera, but might show some other infection; that temperature in hogs results from pneumonia, too heavy feeding, excitement, indigestion, and that temperature is not conclusive that cholera exists. He also testified that in January, 1918, and prior thereto the United States Government in handling hogs on public markets permitted the rejection of more than 15 hogs per carload on account of high temperature without condemning, and permitted vaccination and slaughter, and that under a recent ruling has fixed the number at 15 per carload as the maximum of rejection. Doctor Barnard testified that hogs may be sick and look all right and show temperature; that fever in hogs may be produced or induced by excitement, driving, shipping and strange conditions; that a herd of hogs may take pneumonia, have a severe attack of it, and that be followed by cholera. When he was first called by the plaintiff to examine the hogs he killed and posted two, and from his examination found the kidneys and bladder affected, which indicated cholera and some other complications and some lung trouble.

On the hearing of the motion for a new trial the court reporter testified that at a former trial Doctor Sihler testified that he had familiarized himself with the rules and regulations of the state department, and the United States Government, and that there is never a carload of hogs vaccinated in the stockyards without one or more, or as high as fifteen or twenty high-temperature hogs rejected, and his practice was, and had been, to reject and refuse to vaccinate hogs with temperature of 104 or above. That when these hogs were inspected and vaccinated the United States Government had supervision over such inspection and vaccination. The practice

was that hogs rejected for high temperature were turned over to the commission company and sold on the public market, and went over the scales under the supervision and inspection of the federal inspector, and if they showed signs of being ill or showed signs that they were sick they were tagged and sent to the packing house as not merchantable animals, and the general practice of his profession in handling hogs for inspection and vaccination was to reject or remove such of the hogs as had developed a temperature of 104 or more, and to vaccinate the remainder if they appeared to be healthy, and to certify such vaccination to the state department.

Plaintiff's counsel made affidavit that he did not know until the trial that there were any regulations or rules or customs approved, indorsed or otherwise put into force by the live-stock sanitary commissioner except those set out as exhibits to the petition. That he was surprised by the evidence offered touching this matter and was unable at that time to procure testimony to meet it. Commissioner Mercer made affidavit that during January, 1918, the only rules and regulations in force were those set out in the petition. That at that time where the temperature of hogs exceeded 103 degrees such was deemed abnormal. The plaintiff deposed that he was taken by surprise and that the commissioner was not present at the trial.

On the trial, D. W. Hubbard testified that he purchased the hogs on January 24; that his men yarded them after they were vaccinated in straw-bedded pens and shipped them out on the 25th of January. The cars were bedded with good straw, and there was plenty of room. When he bought them they were in fine shape and none appeared droopy or gaunt. Harry Kennedy testified that he went with the plaintiff to divert the shipment from Cuba to Concordia because they could not reach Cuba from Concordia on Sunday, but could reach Belleville Saturday night. Both cars were well bedded with straw and at least one car had tar paper on the side; there were five dead and one died before they got away; the hogs were fed shelled corn in Belleville. Quite a few of them were weak and scoury.

"It was a comfortable day with little snow on the ground but the road was beaten down and they were all day driving the hogs to the Sissell farm. A number of the hogs had to be picked up because they were weak and could not travel. That this method of driving hogs was a proper method and such is usually followed by himself and other farmers. When the hogs reached the farm they were placed in sheds and bedded down and two boys watched them

all night.  He saw the hogs the next day and they were 'a pretty tough looking bunch, . . .' "

T. H. Yocum testified for the defendant that he helped handle the hogs and assisted in taking their temperature and the hogs looked all right.

Doctor Cairns stated that he was sent to see these hogs by Doctor Sihler after they were vaccinated; that several appeared sick and some of them were dying in the sheds, some showed temperature, and the remainder looked to be in fairly good shape.  He then killed two sick hogs and found some pneumonia condition and evidence of cholera.  The second trip to see the plaintiff's hogs was two or three weeks later; some of them were dying and he had lost quite a number, and others were sick, and the witness found signs of pneumonia; that under the practice in the yards if the hogs were about to break out with cholera and the temperature did not exceed 104 they were passed and vaccinated.  Doctor Sihler testified that the average temperature in hogs is 102.6.

It appears that the showing on the motion for a new trial was to the effect that the live-stock sanitary commissioner deems 103 the approved point in temperature above which a hog should be rejected; that in determining the condition of hogs in January, 1918, under the rules of his department, any temperature above 103 indicated an abnormal condition.  The veterinarians who testified placed it at 104.

It seems strange that after all that had gone before, any kind of surprise should have existed as to the basis of rejection for abnormal temperature, and the showing presenting any surprise on the motion for a new trial must, of course, indicate something besides mere cumulative evidence and must also show sufficient diligence in order to avail the plaintiff.  And, of course, unless it is fairly apparent that if the desired evidence had been before the jury a different result would have been reached, or at least might have been reached, a new trial should not be granted.  We find no indication that when the testimony on this point was received any effort was made to obtain delay and procure the desired controverting testimony, although it would have been comparatively easy under ordinary circumstances to communicate with the commissioner and procure his attendance speedily.  But suppose a new trial were given with the evidence as we find it in the record and the commissioner should be present and testify as indicated by his affidavit.  Is it reasonable to

suppose or conclude that a mere difference of one degree in temperature would cause a different verdict or conclusion to be reached? The jury had full information from numerous witnesses as to the condition of the hogs from the time they were bought until weeks after they were received by the plaintiff, and, some of them doubtless farmers themselves in the plaintiff's own county, they not only found generally for the defendant but by their answers to special questions showed that they felt fully convinced and justified in so doing.

There were two theories as to the case: One, that the damage resulted from improper examination and vaccination—and the other, that it resulted from improper care and conditions after the hogs were shipped to the plaintiff; and the record contains sufficient evidence to sustain the latter theory which was evidently adopted by the jury; and it is impossible to conclude from a survey of the whole situation that the desired evidence if it had been given would have availed the plaintiff.

Complaint is made that the matter of contributory negligence was covered in the instructions. Counsel says that the question of negligence of the defendant and contributory negligence of the plaintiff was not involved, "but that the plaintiff need only show that the hogs were unhealthy, or affected with an infectious or contagious disease at the time they were inspected and vaccinated by the defendant." Generally speaking, this is correct, but the answer alleged that any damage which may have been caused was the result of the plaintiff's negligence in the care of the hogs after they were shipped, and it must be assumed that this was the only negligence imputed to the plaintiff in any way by the jury or intended by the instruction. It was this which the court had reference to in advising the jury that—

"If the plaintiff is guilty of negligence in any manner and this negligence directly contributed to the injury he received from the defendant, the law would not permit him to recover even though the negligence on the part of the defendant is established."

This was made plain by the following language:

"In other words he cannot recover if the injury or loss would not have occured if he himself had used ordinary care and prudence; and it is for the jury to determine from the evidence whether the defendant used such care and prudence in vaccinating the hogs in question and whether the plaintiff used that care and prudence in his care and handling of said hogs thereafter, which under the circumstances and surroundings, would have been used by persons exercising ordinary care and prudence in said acts."

It is suggested that in cases of wanton negligence the doctrine of contributory negligence does not apply, but we do not find any charge of wantonness in the petition and it was not necessary for the plaintiff to show any in order to recover. It is said:

"The jury should have been told that the plaintiff could recover his resulting damages, if the defendant violated the laws or rules invoked, and if thereby sick, unhealthy or infected hogs were shipped to the plaintiff; and that only did negligence and contributory negligence become material, in case the law and rules pertaining to the handling of these hogs were not violated by the defendant, . . ."

The plaintiff requested eleven instructions in accordance with his views, but, although they were refused, twenty-nine were given by the court covering the entire ground and fairly charging the jury touching the issues involved and their duty in the premises, embodying in substance a number of those offered by the plaintiff.

Fault is found that evidence was introduced touching what counsel denominates alleged customs at the stockyards. Instruction No. 15 is criticised for telling the jury there was such a custom and for leaving it to them only to find out whether or not it had been approved by the commissioner. The language of instruction No. 15, however, is—

"You are instructed that if you find from the evidence that these usages and customs were approved and endorsed by the live stock commissioner, then you would be justified in finding any acts of the defendant in accordance therewith to be proper and skillful and not negligent. But on the other hand if you do not find such usages and customs were approved and endorsed by the sanitary commissioner but that they were merely usages and customs that had grown up in the yards, then you may consider . . ."

As a matter of fact there was no dispute that there were such customs and usages at the stockyards and there is none now, the only dispute being whether or not they were fully approved by the livestock commissioner. Hence, the court did not err in referring to the evidence on this point.

Authorities are cited holding that usages and customs cannot be recognized when contrary to statutory regulations, as to which, of course, there can be no dispute. The jury were to determine, and what the court wanted them to determine was, whether the part taken by the defendant in relation to these hogs was such as to render it liable on account of failure to observe proper care and proper skill. And, of course, the practice established and approved by experts in that line and by the United States department in

charge of such matters was competent evidence as to what constitutes such care and skill. And, in addition, if such established practice is approved by the state sanitary commissioner, evidence thereof must necessarily be competent. It is not a case of seeking to place a custom before the law, but simply the ordinary one of showing by those who know by experience and qualification what it takes to constitute the required care and skill.

We have carefully considered all the questions raised by the plaintiff, but find no material error.

The judgment is affirmed.